## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| CAROL A. POST, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 04-3230 |
| | : | |
| HARTFORD INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | |

_____:

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                    **OCTOBER 5, 2005**

Carol A. Post ("Post") brought this action against Hartford Insurance Company ("Hartford") alleging that Hartford violated her rights under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA") when they decided that she was no longer "Totally Disabled" as defined by their long-term disability insurance plan.  Presently before me is Hartford Motion for Summary Judgment, Post's Memorandum in opposition to Hartford's Motion, and Hartford's Reply thereto.  For the following reasons, I shall grant Hartford's Motion.

## I.      BACKGROUND

### A.      The Overlook Hospital Association Long Term Disability Benefit Plan

Post worked as both a dentist and a pharmacist for the Overlook Hospital Association. Post participated in a group long-term disability ("LTD") benefit plan created by Overlook Hospital Association with Hartford as the insurer.  Hartford's Plan explicitly gives its administrator the discretionary authority to determine eligibility for benefits and to interpret all "terms and provisions of the Group Insurance Policy."  Hartford both funds and administers the

benefits of the Plan.  Under the Plan:

> Totally Disabled means that: (1) during the Elimination Period; and (2) for the next 24 months, you are prevented by Disability from doing all the material and substantial duties of your own occupation.  After that, and for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation or work which you are or could become qualified by: (1) training; (2) education; or (3) experience.

(HLI00005).  The Plan also provides that Hartford can terminate benefits for, among other reasons, failure of the claimant to offer proof of a continued disability or refusal to submit to an examination required by Hartford.  (HLI00023).  The monthly benefit paid under the Plan is offset by the amount of any "other income from any employer or for any work" paid to the claimant, as that term is defined in the Plan.  (HLI00027).  Post voluntarily contributed to this LTD benefit plan and was eligible to receive benefits under it on January 1, 1993.

**B.     The Accident**

On October 20, 1993, Post had major dental surgery that kept her out of work for five weeks.  (HLI01092).  She resumed working a few days before her car accident.  (HLI00944).  On November 27, 1993, Post was a passenger in a car that was rear-ended and pushed into traffic where two more motor vehicles collided with it.  (HLI00764).

On May, 10, 1994, Carol N. Cote, Director of Physical Therapy at the North Jersey Health & Pain Relief Center, summarized her findings as:

> consistent with traumatic cervical thoracic and lumbar strain with secondary dysfunction involving the entire upper and mid cervical as well as the thoracic and lumbar spine.  She also has a posture syndrome which is perpetuated by the dysfunction and muscle strain.  Her symptoms are more acute on the left, which is also reflected on the left tempromandibular joint.  She is secondarily relatively hypomobile of the right TMJ compared to the left.  She has also had significant anterior cervical soft tissue involvement.

(HLI00454-457).

On September 27, 1994, Post saw Michael John Fiore, M.D., P.A., for treatment. (HLI00436-438).  During that visit, Dr. Fiore concluded that Post was "not disabled" and had "reached maximal medical benefits."  (HLI00438).

**C.    Post's Brief Return to Work**

Post returned to work again in January 1995.  On March 15, 1995 Gregory J. Mulford, M.D. stated that Post "will continue with her attempts at working full-time, but if her pain persists she may be forced to look at long-term disability as an option." (HLI00986).  Post attempted to work as a pharmacist, but stopped working on May 24, 1995, due to pain caused from intractable cervical pain and lumbar radiculopathy.  (HLI01299).

On June 9, 1996, Post visited her neurologist and treating physician, Carolyn D. Britton, M.D., at New York Columbia Presbyterian Hospital.  Dr. Britton diagnosed Post with suffering from "a 'whiplash' injury leading to cervical strain or sprain and resulting in a chronic post-traumatic pain syndrome."  (HLI00946).  Dr. Britton observed that Post's brief attempts to return to work duties were unsuccessful because of ongoing pain.  (HLI00945).

On November 7, 1995, Dr. Mulford examined Post again and determined that Post "is not yet able to return to any activities that require prolonged sitting or lifting."  (HLI00982).  Dr. Mulford also explained that, "given persistence of her symptoms and her limitations, I do not believe she is presently able to successfully return to the previous job."  (HLI00982).  On March 17, 1996, Dr. Britton stated that Post was totally disabled from any job and offered a likely return to work date of November 30, 1996.

On March 19, 1996, Dr. Mulford noted that Post was doing relatively well with her home

exercises and pain self-management, but also noted that "she continues to have pain primarily in the upper cervical spine, and occasionally into the left upper scapular region" and that "lifting and straining continue to aggravate her symptoms most."  (HLI00981).  Dr. Mulford further stated that Post's "most significant abnormality on her examination continues to be her cervical range of motion which shows markedly restricted flexion."  (HLI00981).  Finally, Dr. Mulford offered that "I see no significant change in her examination, compared to previous assessments." (HLI00982).

### D.    Post's Application for LTD Benefits is Approved and her Treatment Continues

On April 26, 1996, Post completed a Total Disability Claim indicating that she was totally disabled on the basis that she was suffering from cervical sprain/strain, severe chronic myofascial pain syndrome, cervical facet joint arthropathy and occipital and suboccipital neuralgia as a result of the car accident.  (HLI01012-23).  At that time, Dr. Britton indicated that Post was suffering from cervical sprain and intractable cervical pain and spasm, which resulted in the subjective symptoms of pain in her neck and stiffness and objective findings of "pain cervical and trapezius spasm; rom cervical spine."  (HLI01017).

On June 27, 1996, Overlook employee, Thomas Vogt, completed a Physical Demands Analysis Form indicating the demands involved for Post as a pharmacist.  On that form, Mr. Vogt indicated that a pharmacist needs to sit for two hours, and stand and walk for three hours during an eight hour work day.  According to Mr. Vogt, a pharmacist also needs to lift between 11 and 50 pounds occasionally, but never more than that.  Mr. Vogt indicated that a pharmacist needs to climb, balance and feel on occasion, as well as stoop frequently and reach and handle constantly.  (HLI00998-99).  Finally, Mr. Vogt classified the job as "medium work."

4

(HLI.00999).

At the request of Hartford, Joel Harris, D.D.S., performed a Physical Capacities Evaluation Form on July 22, 1996. Dr. Harris reported that Post had severe pain in her head, neck and lower jaw. He also noted that her severe back pain limits her mobility and that she cannot sit in a chair for treatment purposes without pain. (HLI00990). Dr. Harris recommended that Post could stand, sit, walk and drive for one hour each during an eight hour work day, but she could never lift, climb, balance, stoop, kneel, crawl, crouch, reach, finger, handle, or feel, and had reached her maximum medical improvement. (HLI00990). Dr. Harris indicated that Post was capable of handling sedentary work. (HLI00990).

On August 24, 1996, Dr. Britton completed a Physical Capacities Evaluation Form on which she reported that Post could sit, stand, walk, and drive for one hour each in an eight hour day, with rest. She indicated that Post could lift up to ten pounds occasionally, but never more. Dr. Britton also indicated that she could climb, stoop, reach, handle, finger and feel on occasion, but could never balance, kneel, crouch or crawl. Dr. Britton concluded that Post was completely disabled from returning to work at that time. (HLI00956-957).

On March 24, 1997, Hartford wrote Post informing her that her claim for LTD benefits was approved, effective November 21, 1995 through December 13, 1997, in the amount of $25,413.93. (HLI00895-98). Hartford also informed Post that, in order to qualify for benefits beyond December 6, 1997, she would be required to meet the Plan definition of Total Disability because that was the date when the Elimination Period plus 24 months was over. The test for Total Disability had changed from Post being prevented from performing her own occupation, to being prevented from performing any occupation. (HLI00895-96; HLI00005). Hartford notified

5

Post's attorney on April 1, 1997.  (HLI00891).

On April 25, 1997, Dr. Britton completed a Physical Capacities Evaluation Form at Hartford's request and documented that Post could sit for two hours, stand and walk for one hour, lift and carry up to ten pounds, occasionally climb, balance, stoop, kneel and reach, but never crouch or crawl.  (HLI00886).  Dr. Britton opined that Post was "disabled completely" and it was unknown as to when Post could return to work at her regular occupation or return to work in a lighter duty capacity.  (HLI00887).

On May 1, 1997, Post was examined by Ellen Field-Munves, M.D., who reported that Post had chronic pain syndrom and fibromyalgia that limited her range of motion on the neck. (HLI00746-48).  Dr. Field-Munves concluded that "[a]t present this [patient] is totally disabled from any occupation."  (HLI00748).

On September 26, 1997, Dr. Britton completed another Physical Capacities Evaluation Form, wherein she states that Post could not perform any degree of work, that she had not yet obtained maximum medical improvement and offered no return to work date due to Post's disabled status.  (HLI00866).

**E.    Post is Awarded Social Security Disability Benefits**

One year later, on September 28, 1998, the Social Security Administration notified Post that she had been awarded Social Security disability benefits.  (HLI00540-542).  On October 20, 1998, Hartford requested the Notice of Award from the Social Security Administration so that it could "calculate the correct long-term disability benefit."  (HLI00847).  Post's attorney responded that Hartford was not entitled to receive a portion of Post's Social Security Disability benefits pursuant to the language of the LTD benefit plan.  (HLI00719).  Eventually, Hartford

stopped requesting information regarding Post's Social Security award of disability benefits.

On June 3, 1999, Dr. Britton performed a Physical Capacity Evaluation Form at the request of Hartford, wherein Dr. Britton stated that Post had reached "maximum medical improvement," and stated that there was no date for Post to return to work at her regular occupation or return to work in a lighter duty capacity.  Dr. Britton was uncertain as to whether Post could ever return to work at her regular occupation or lighter duty.  (HLI00818).

**F.    Hartford Investigates Whether Post Continues to be Totally Disabled**

In early 2000, Hartford began surveillance of Post.  On February 28, 2000, Sabrina A. Misiaszek sent an internal memorandum to Hartford employee Nicholas A. Courto on February 28, 2000 stating that surveillance was unsuccessful as the "claimant was not observed leaving her home."  (HLI00793).  Misiaszek suggested to Courto that he should re-request Post's current medical records from "1/1/98 to present," copies of Post's tax records including attachments and schedules from 1995 to 1999, an unaltered Authorization that would have permitted Hartford to request this documentation, and a Claimant Questionnaire.  (Id.).

One day later, on February 29, 2000, Hartford requested that Post send her tax returns for the tax years 1995-1999, a completed Authorization form and Claimant Questionnaire. (HLI00787).  On March 13, 2000, Post responded with a completed and signed Claimant Questionnaire and Authorization to Obtain and Release Information, but advised by her attorney, Post refused to submit the tax returns and claimed that she was not working and had no earned income from 1995-1999.  (HLI00420; HLI00726).  On May 12, 2000, Hartford requested Post's 1995-1999 tax returns again.  This time, Hartford cited the Plan's language specifying that Hartford considered "all other income from any employer or for any work" that Post received

when calculating her monthly benefit.  (HLI00027; HLI00415-16).  On June 30, 2000, Post,

through her attorney, sent her 1995-1999 tax returns and protested that she was only agreeing

because Hartford threatened to terminate her LTD benefits.  (HLI01345; HLI00397-408;

HLI00368-94; HLI00347-66).

Beginning on May 23, 2000 and lasting through September 17, 2002, Post received

treatment from Andrew G. Kaufman, M.D., of Summit Pain Management, without any referral.

Dr. Kaufman initially assessed Post's condition as "diffuse myofascial pain, status post MBA

with cervical strain, and occasional cervicogenic headache."  (HLI01224).  Dr. Kaufman treated

Post with injections into her trigger points and found that she experience a "significant decrease

in pain" on some occasions and "almost complete resolution of the myofascial pain" on others.

(HLI01213; HLI01218; HLI01220; HLI01224).

On July 25, 2000, Dr. Britton completed Hartford's "Attending Physician's Statement of

Continued Disability" where he opined that Post suffered from intractable cervical spasm and

pain, cervical sprain, and neck and lower back pain.  (HLI01313-14).  Further, Dr. Britton opined

that Post had "no improvement, possibly permanent."  (HLI01314).  Dr. Britton also indicated

that Post was limited to driving "short distances" and for "less than 20 minutes."  (HLI01313-

14).

On May 23, 2001, Post completed a Claimant Questionnaire stating that she had:

cervical myofascial pain syndrome, cervical facet joint arthropathy, cervical spinal
cord compression as a result of multiple disk protrusions, lumbar facet joint
degenerative changes, and severe arthritic changes of the TMJ.  Because of these
conditions [Post had] severe and continuous pain in [her] jaw, neck shoulders and
back [and was] unable to sit or stand for periods of time (>20-30 min.) without
worsening of symptoms, and any reaching, lifting, or movement of the head/neck
exacerbate[d] [her] pain.

8

(HLI01318).  Post indicated that she was unable to engage in any work activity or many physical activities, including swimming, racquetball, hiking, canoeing, cooking and cleaning. (HLI01318).

In June, 2001, Hartford attempted to have a third party, Empire Medical Management, set up a Functional Capacity Evaluation ("FCE") for Post to evaluate her claim for continued benefits.  (HLI01048-49).  The parties disagree on whether Post refused the FCE.  Hartford claims it instructed Empire Medical to make arrangements through Post's lawyer, (HLI00314), and that its efforts were rebuffed by Post's lawyer who claimed Post had not agreed to submit to an FCE.  (HLI00059-60).  Post claims that when Empire Medical contacted her attorney, it stated that Post had requested the FCE.  Post's attorney disagreed, but Post claims that she never refused to undergo a FCE, nor was she under an obligation of the LTD policy to schedule one. (Pl.'s Opp. Mem. 9).  As a result, Empire Medical Management notified Hartford on June 18, 2001, that Post refused to submit to the FCE.  (HLI01282-83).

Thereafter, Hartford contacted the Medical Advisory Group ("MAG") requesting that it "review [Post's] medical records and speak to Post's primary care physician in order to identify [Post's] functional capabilities and address the claimant's ability to perform [a] sedentary to light occupation."  (HLI01299).  On September 20, 2001, Ekaterina Malievskaia, M.D., an Associate Medical Director of MAG, reported her findings from her review of Post's medical records and her conversations with Post's treating physicians Dr. Kaufman and Dr. Briton.  (Id.).  Dr. Kaufman reported that his involvement with Post was limited to pain management and he could not comment on her functional capacity.  (HL01307-08).  Dr. Britton reported Post sustained a severe whiplash injury to her neck in a car accident several years prior, and had been suffering

from intractable cervical pain since that time.  Dr. Britton indicated that Post had pain, which was not an objective finding, and that her activities such as sitting, standing and walking were severely limited by pain, so she was not able to work at any level on a full-time basis. (HLI01305-06).  Post's available medical records included notes from visits to physical therapist Carol N. Cote, Dr. Fiore, Dr. Weidenbaum, Dr. Britton, Dr. Field Munves, physical therapist Daniel Danis, as well as an FCE from physical therapist H. James Phillips, and an MRI of Post's lumbar spine.  (HLI01299-1304).  Dr. Malievskaia concluded that Post was "fully capable of meeting the demands of sedentary to light occupation on a full-time basis."  (HLI01304).  Dr. Malievskaia also found no objective evidence substantiating Post's inability to perform a sedentary to light occupation.  (Id.).

## G.  Hartford Terminate's Post's LTD Benefits, Post Appeals and is Denied

On January 4, 2002, Hartford terminated Post's LTD benefits because she was "no longer Totally Disabled as defined and is not longer eligible for benefits under this policy."  (HLI01240-46; HLI01281).  Hartford cited the medical record, Dr. Malievskaia's report, and that Post refused to undergo an FCE.  (HLI01240-46).  Hartford concluded that Post was capable of sedentary to light work, and that the Dictionary of Occupational Titles lists both Pharmacist and Dentist as light work.

On January 10, 2002, Post appealed the decision of Hartford to terminate her benefits. (HLI01279).  Post disagreed with the medical record and the finding that she had refused to submit to an FCE.  On January 13, 2002, Russell J. Rentler, M.D., Post's then-treating general physician, sent a letter to Hartford stating:

This letter is in regards to my patient Dr. Carole Post.  As you know, she has been

10

on long-term disability due to a chronic illness stemming from an automobile accident. She suffers from a myofascial pain syndrome, chronic fatigue syndrome and chronic headaches. She has been on multiple narcotics and is currently unable to function in any work capacity due to her severe disabling symptoms. She has seen multiple specialists including neurologists, orthopedists, physiatrists, and pain management specialists who have all concurred with her diagnoses. It is my understanding that you have requested she undergo a functional capacity test. I strongly recommend that she cannot undergo this test since it will exacerbate her symptoms. The patient recently attempted to clean her window and was [at] my office later with severe upper extremity pain and weakness. The date of that visit was December 17 of this year. I hope this information has been helpful to you and will clarify my reasoning for why this patient need not undergo further testing of her functional capacities.

(HLI01278).

On March 25, 2002, Hartford upheld its termination of Post's LTD benefits. Hartford gave no weight to Dr. Rentler's letter because it was inconsistent with his contemporaneous notes. Hartford also noted that on November 22, 1999, Post discussed with Dr. Rentler an appointment she had with a prosthodontist from Chronic Pain in Boston who reported that, based on an EMG, Post should not have been having any pain. (HLI01254). Once again, Hartford found that the medical evidence showed that Post no longer met the policy definition of total disability. (HLI01238). Given that Post raised concerns that Hartford failed to provide written notification of its intent to have her undergo an FCE and that there was confusion over who was responsible for arranging the evaluation, Hartford agreed to arrange for Post to undergo an examination and to consider the results of such to determine whether Post continued to be eligible for LTD benefits. (HLI01239).

Post's next step was to file a complaint with this Court on April 8, 2002. Ultimately, the case was dismissed without prejudice by stipulation of the parties. Among other conditions, the parties agreed that Post would be given an additional appeal pursuant to her production of all her

additional medical records and that she would undergo another FCE.  Afterwards, Hartford would determine whether an Independent Medical Evaluation and/or an Independent Medical Review would be necessary.  Following the settlement, Post informed Hartford that her doctors would not give her a prescription for an FCE because this type of examination would exacerbate Post's symptoms.  Therefore, the parties agreed to allow Post to undergo an IME in place of the FCE.

On October 20, 2002, Post was examined by Russell K. Portenoy, M.D., Chairman of the Department of Pain Medicine and Palliative Care of Beth Israel Medical Center in New York, New York.  (HLI01198).  Dr. Portenoy assessment affirmed that Post "has a long standing chronic pain syndrome compromising a chronic posttraumatic vascular headache, a posttraumatic idiopathic pain involving most of the body and abdominal pain also of unclear cause but consistent with irritable bowel syndrome.  The pain is associated with a very high level of disability."  (Id.).

On February 27, 2003, Ronald Kaplan, M.D., also of the Department of Pain Medicine and Palliative Care of Beth Israel Medical Center, provided a summary of his review of Dr. Portenoy's medical records of Post.  (HLI01132; HLI01136-40).  Dr. Kaplan indicated that Post's medical records showed that she experienced "quite a bit of facial pain that is most likely attributable to the auto accident and it seems that it is the source of all of her pain generation throughout the head and neck."  (HLI01138).  Dr. Kaplan wrote that Post went to St. Luke's Roosevelt Hospital Center on June 28, 2002 because she was experiencing severe headaches as a result of the accident approximately four times per month, and she felt quite depressed at that time.  (Id.).  Dr. Kaplan noted that the reports showed that Post was on several medications,

including Flexeril, Vioxx, Lorcet, Elavil, Clonidine, Pamelor, Zoloft, Neurontin, and Zanaflex, but none were of much benefit.  Physical therapy only worsened Post's symptoms.  Additionally, chiropractic manipulation, acupuncture, Yoga, biofeedback and TENS unit were also used, but they provided no meaningful benefit.  Injections were only helpful short-term, and OxyContin made the pain tolerable.  (HLI01139-40).

**H.      Post Undergoes an IME**

On August 14, 2003, Christopher G. Lynch, M.D., conducted an IME of Post. (HLI01083-88).  Dr. Lynch reported that Post complained of severe TMJ area pain, upper and lower back, shoulder, neck, trapezius, foot, leg, arm and hand pain, and overall body pain 24 hours-a-day.  Medications helped her pain somewhat, but the pain persisted.  Trigger point injections helped, but only temporarily.  Dr. Lynch noted that Post's self-reports of pain were contradicted by her physical appearance; she appeared to be in no distress although claiming to be in total body pain.  (HLI01083-84).

Upon examining Post, Dr. Lynch found that her upper extremities revealed no deformities, there was no focal motor, reflex or sensory loss, and she had a normal pain free range of motion in all her upper extremity joints, including her shoulders.  Post did not have tenderness over her forearm or upper arm.  (HLI01084).

Examining Post's head, neck and back revealed no deformities, and her range of motion in the cervical spine was 15 to 20 degrees of left and right lateral rotation with normal flexion and extension.  Her range of motion in the low back was 60+ degrees of flexion with 5-10 degrees of extension.  Dr. Lynch noted:

Palpation over the cervical and thoracic regions reveals no definite tenderness and

13

no trigger points were palpated.  Palpation over the lumbosacral spine reveals no
tenderness.  She was somewhat tender over the greater trochanters bilaterally.  No
definite trigger points were noted.  Straight leg raising is negative bilaterally.
Motor, reflex, and sensory exams were normal in the lower extremities.  She has
normal pain free range of motion in all lower extremity joints.  Gait is normal.

(HLI01084-85).

Dr. Lynch cited Post's first MRI study in December, 1993, which was normal.

Thereafter, her treating physicians indicated that subsequent MRI studies showed degenerative

changes in the cervical and lumbar spine with some disc protrusions.  (HLI01085).  Dr. Lynch

recorded that Post received numerous medications, including Oxycontin and Oxy-IR, but she still

complained of chronic total body pain.  (HLI01085).  Dr. Lynch did not find objective evidence

to support total disability, but instead found that Post's apparent disability was based totally upon

her subjective complaints.  (Id.).  Dr. Lynch found that the only diagnosis of Post that her treating

physicians agreed upon was myofascial pain syndrom, also known as fibromyalgia.  Dr. Lynch

explained that fibromyalgia is defined as the "presence of chronic widespread muscular pain with

associated findings of eleven out of the usually recognized eighteen trigger points."  Post,

however, did not have any trigger points in her examination, and by reviewing the records, Dr.

Lynch found that she probably had a few trigger points, but no where near the required eleven.

(HLI01085, HLI01087).

According to Dr. Lynch, the objective medical evidence was not consistent with Post's

reported level of impairment.  (HLI01087).  Dr. Lynch concluded that she could perform

sedentary or light work as usually defined, including lifting up to 20 pounds maximum with

frequent lifting or carrying of items up to 10 pounds.  In his opinion, Post had the ability to

change posture at "fairly frequent intervals."  (Id.).  Dr. Lynch also concluded that Post had a

chronic pain disorder with major psychological components.  He believed that the medications

and treatment she was given over the years were not effective because her major problem was not

a physical one of myofascial or musculoskeletal pain.  He found that the majority of her pain was

psychogenic in nature and needed to be addressed by appropriate psychiatric and/or

psychological means rather than narcotic medications.  (HLI01087-88).

I.       **Hartford Denies Post's Appeal Again**

On October 2, 2003, Hartford upheld its decision to terminate Post's benefits effective

January 4, 2002.  (HLI01068).  Hartford noted that while it had already reviewed her appeal and

determined that Post was not entitled to benefits on March 25, 2002, it had indicated at that time

that its decision was subject to additional review after Post underwent an FCE.  Since it was

determined that Post would not submit to such an evaluation, but would submit to an IME, this

examination was conducted instead.  (Id.).  Hartford explained that, based on a review of Dr.

Lynch's findings, Post no longer met the definition of Totally Disabled as originally explained in

its January 4, 2002 letter and, therefore, she was no entitled to additional LTD benefits.

(HLI01070).  Given the restrictions and limitations imposed upon Post by Dr. Lynch, Hartford

determined that Post:

> would not be prevented by disability from doing any occupation or work for
> which she is qualified by training, education or experience.  More specifically,
> these restrictions would not prevent Ms. Post from performing the essential duties
> of either a pharmacist or a dentist, occupations [she] engaged in prior to filing her
> disability claim.

(Id.).  Therefore, Hartford concluded that the medical evidence did not support a condition of

total disability as defined by the Plan.

Post filed this action in the Court of Common Pleas of Lehigh County, Pennsylvania on

15

or about June 17, 2004, and Hartford removed it to this Court on July 8, 2004.  Post filed a

motion to remand on August 13, 2004, which was voluntarily withdrawn by stipulation of the

parties on September 21, 2004.   The parties also agreed to allow Post to amend her complaint.

Post filed an amended complaint on October 15, 2004.  Post filed a second amended complaint

on March 10, 2005 alleging that Hartford violated Sections 502(a)(1)[1] and 502(a)(2)[2] of the

Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA").   Hartford filed

this motion for summary judgment on June 17, 2005.

## II.   <u>STANDARD OF REVIEW</u>

Deciding Hartford's motion for summary judgment requires me to consider two standards

of review: the summary judgment standard pursuant to Federal Rule of Civil Procedure 56 and

the arbitrary and capricious standard under ERISA.  <u>Byrd v. Reliance Std. Life Ins. Co.</u>, 2004

U.S. Dist. LEXIS 24682, at *6 (E.D. Pa. Dec. 7, 2004).

## A.   **Summary Judgment Standard**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

proper "if there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law."  FED. R. CIV. P. 56(c).  Essentially, the inquiry is "whether the

evidence presents a sufficient disagreement to require submission to the jury or whether it is so

one-sided that one party must prevail as a matter of law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

---

[1]  Section 502(a)(1) provides that "a civil action may be brought . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

[2]  Section 502(a)(2) provides that "a civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary" for appropriate relief when a fiduciary violates his duties under ERISA.  29 U.S.C. §§ 1132(a)(2); 1109.

U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  <u>Anderson</u>, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law.  <u>Id.</u> at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  <u>Williams v. Borough of W. Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989)(citing <u>Celotex</u>, 477 U.S. at  325 (1986)).  Further, the non-moving party has the burden of producing evidence to establish <i>prima facie</i> each element of its claim.  <u>Celotex</u>, 477 U.S. at 322-23.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper.  <u>Id.</u> at 322; <u>Wisniewski v. Johns-Manville Corp.</u>, 812 F.2d 81, 83 (3d Cir. 1987).

**B.     ERISA Standard**

Post's allegation that Hartford's denial of her LTD benefits in violation of Section 502(a)(1) raises a separate standard of review under ERISA.  Both parties agree that where, as here, a plan governed under ERISA provides the administrator with discretionary authority to determine benefit eligibility, I must review the determination under an arbitrary and capricious standard.  <u>See e.g.</u>, <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 111-12 (1989).

17

Under the arbitrary and capricious standard, I may not reverse the administrator's decision denying disability benefits unless that decision was "without reason, unsupported by substantial evidence[,] or erroneous as a matter of law." Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993). The scope of this review is narrow and I am not free to substitute my own judgment for that of Hartford's plan administrator in determining eligibility for plan benefits. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997). In short, the arbitrary and capricious standard of review provides an "uncommon privilege in the American legal system - a limited right to be wrong . . . without being reversed." Maurice Rosenberg, Judicial Discretion of the Trial Court: Viewed from Above, 22 Syracuse L. Rev. 635, 649 (1971).

However, both Hartford and Post also agree that a "heightened arbitrary and capricious standard of review" is applicable here. This "heightened standard" is applicable where, as here, an insurance company determines the eligibility for benefits and also pays benefits out of its own funds. Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 388 (3d Cir. 2000). Courts presume a conflict of interest because the insurance company is presumed to have "an active incentive to deny close claims in order to keep costs down and keep themselves competitive so that companies will choose to use them as their insurers." Id. Therefore, where there is this conflict of interest on the part of administrators, I must review the denial of benefits under a "heightened arbitrary and capricious" standard. Id. at 387.

Under this heightened standard, I apply a sliding scale that takes into consideration the degree of conflict on the part of the administrator: the greater the evidence of conflict, the greater the scrutiny. Id. at 389. Utilizing this sliding scale, I must evaluate the presence and severity of several factors related to the conflict: (1) sophistication of the parties; (2) information accessible

18

to the parties; (3) exact financial arrangement between the insurer and the company; and (4) the status of the administrator, as the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction.  See Pinto, 214 F.3d at 392.  I may also evaluate any procedural anomalies, biases, or unfairness in determining the level of scrutiny applied to an administrator's decision.  Id.

1.    Sliding Scale Factors

Neither party discussed the four factors in their briefs.  After reviewing the record, I find that Hartford has a slightly heightened conflict of interest in determining Post's eligibility for LTD benefits.  Stratton v. E.I. Dupont de Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004). First, as to the sophistication of the parties, although Post lacked knowledge of the legal intricacies of ERISA, she was represented by counsel during most, if not all, of the claim process. It follows that this factor should not raise the standard of review significantly.  Second, the record indicates that the exchange of information was hindered at times only by Post's attorney, who was zealously advocating for his client.  Hartford, meanwhile, conscientiously attempted to keep Post apprised of the information it had at its disposal and the reasons for denying Post's LTD benefits.  The second factor does not raise the arbitrary and capricious standard.

Evidence of the third and fourth factors is not apparent in the record; however, I assume that Hartford is in healthy financial condition, thus removing the fourth factor from my inquiry. As for the third factor, the exact financial arrangement between the insurer and the company, more attention is required.  The Plan is funded by Hartford on a case-by-case basis instead of a fixed price basis that has been actuarially determined.  It is possible, then, for Hartford to have some incentive to deny coverage on individual requests, assuming that it has no interest in

19

"avoiding the loss of morale and higher wage demands that could result from denials of benefits." Nazay v. Miller, 949 F.2d 1323, 1335 (3d Cir. 1991). However, the Third Circuit has repeatedly noted that "a situation in which the employer 'establishes a plan, ensures its liquidity, and creates an internal benefits committee vested with the discretion to interpret the plan's terms and administer benefits' does not typically constitute a conflict of interest." Stratton, 363 F.3d at 254-55 (quoting Pinto, 214 F.3d at 383). Hartford's benefits Plan is, in large part, described by this description. Thus, the third factor counsels for only a slightly heightened standard. Applying this low end of the sliding scale of review, "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Orvish v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., 222 F.3d 123, 129 (3d Cir. 2000).

2.    Procedural Anomalies, Biases, or Unfairness

Even when there is no evidence of inherent structural conflicts, courts have been on the high end of the sliding scale (less deference) when there is evidence of procedural anomalies, bias, or unfairness. Pinto, 214 F.3d at 394. Where courts have found evidence of procedural anomalies, bias, or unfairness, significantly greater scrutiny has been applied to the administrator's decision. Id. Examples of procedural anomalies include an administrator who:

> (a) relies on the opinions of non-treating physicians over those of treating physicians without explanation, Kosiba v. Merck & Co., 384 F.3d 58, 67-68 (3d Cir. 2004); (b) fails to follow the plan's notification provisions and conducts self-serving paper reviews of medical files, Lemaire v. Hartford Life and Accident Ins. Co., 69 Fed. Appx. 88 (3d Cir. 2003); (c) bases its negative decision on inadequate information and incomplete investigations, Friess v. Reliance Standard Life Ins. Co., 122 F.Supp. 2d 566, 574-75 (E.D. Pa. 2000); (d) reverses an earlier decision allowing benefits without any new evidence that supports the reversal, Pinto, 214 F.3d at 394; (f) ignores the recommendations of its own claim

20

managers that benefits should be awarded, Id.

Gigante v. Prudential Insurance Co. of Amer., Civ. No. 04-0780, 2005 WL 670696, at *7 (E.D. Pa. Mar. 22, 2005).

At first glance, procedural anomalies appear to form a pattern of Hartford being overly aggressive in its attempts to reduce or eliminate Post's LTD benefits and then attempting to rectify the situation when it realized its error. Although I am bound to view all inferences in favor of Post, it must be pointed out that some of Post's allegations are tempered by a legal framework. I shall analyze each of Post's allegations separately.

First, in 1998 Hartford wrongly attempted to offset Post's LTD benefits with her Social Security Disability benefits, but later dropped the request and adopted Post's position. Post also argues that Hartford's requests for her tax returns from 1995 to 1999 are evidence that it was attempting to take a Social Security offset. However, under the terms of the Plan, the benefit calculation requires Hartford to subtract from Post's monthly benefit "all other income from any employer or for any work." (HLI00027).

Second, in January 2002, Hartford determined that Post was no longer eligible for LTD benefits, in part, because Post had refused to under go an FCE. In its letter to Post, Hartford emboldens the following plan language, "The Hartford will cease benefit payment on the first to occur of: **(3) the date you refuse to be examined, if the Hartford requires an examination;**". (HLI01282). This is the only emboldened text of the letter and creates an inference that Post was rejected for refusing to submit to examination that Hartford required. Post appealed and Hartford realized that there was confusion over a lack of notification and who was responsible for setting up the FCE. On March 25, 2002, Hartford upheld the January decision to terminate Post's LTD

benefits, but allowed her another opportunity for Post to undergo an FCE.  When Post was told

by her doctors that she could not undergo the physical strain of an FCE, Hartford allowed her to

undergo an IME.  It must be noted that a plan administrator is not obligated to conduct an IME of

a claimant when making its disability determination.  Thompson-Harmina v. Reliance Standard

Life Ins. Co., No 04-0425, 2004 WL 2700342, at *3 (E.D. Pa. Nov. 23, 2004).

Third, the January 4, 2002 decision is also notable because it relies heavily on the opinion

of Dr. Malievskaia who only reviewed the medical record while disregarding numerous treating

physicians who found Post to be disabled.  Rejecting a treating physician's opinion will not raise

the level of scrutiny in this case.  "[P]lan administrators are not obliged to accord special

deference to the opinions of treating physicians" because there is also a potential conflict of

interest on the part of "a treating physician who, in a close case, may favor a finding for the

patient."  Stratton, 363 F.3d at 258 (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822

(2003)).  As the Supreme Court stated in Black & Decker:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's
> reliable evidence, including the opinions of a treating physician.  But, we hold,
> courts have no warrant to require administrators automatically to accord special
> weight to the opinions of a claimant's physician; nor may courts impose on plan
> administrators a discrete burden of explanation when they credit reliable evidence
> that conflicts with a treating physician's evaluation.

538 U.S. at 823-24.  Accordingly, Hartford's rejection of Post's treating physicians will not raise

the level of scrutiny in which I examine the plan administrator's decision.

Finally, Hartford attempted video surveillance of Post.  Although this tactic is intrusive,

nothing in the Plan prohibits Hartford from conducting video surveillance as part of its review to

determine the veracity of Post's disability claim.  More importantly, this tactic is tacitly accepted

by the Third Circuit Court of Appeals as an appropriate evidence gathering technique.  Russell v. Paul Revere Life Ins. Co., 288 F.3d 78 (3d Cir. 2002).  Thus, the video surveillance of Post will not serve to raise the level of scrutiny in which I examine the plan administrator's decision.

In the aggregate, the aggressive tactics Hartford employed and its reliance on a non-treating physician's opinion as the basis for the initial decision to deny Post's LTD benefits suggest, at most, minor procedural irregularities indicating possible bias against Post.  Therefore, I will employ a moderate level of scrutiny when I analyze the administrator's decision.

## III.   **DISCUSSION**

In her second amended complaint, Post brings claims pursuant to Sections 502(a)(1) and 502(a)(2) of ERISA.  Hartford argues that no reasonable trier of fact could find in favor of Post on either issue and that summary judgment should be granted.  I agree with Hartford for the following reasons.

### A.   **Section 502(a)(1)**

The primary issue before me is whether Hartford acted arbitrarily and capriciously when it determined that Post was not "Totally Disabled" as that term is defined by the Policy.  For this analysis I may only review the record that the administrator had at the time the decision was made.  See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997).  Finding myself on the low end of the sliding scale, I will apply a moderately heightened arbitrary and capricious standard to Hartford's denial of Post's LTD benefits.  I will only overturn Hartford's denial of Post's LTD benefits "if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan."  Orvosh, 222 F.3d at 129. Once again, I am not free to substitute my own judgment for that of Hartford in

23

determining Post's eligibility for Plan benefits.

On October 3, 2003, Hartford issued its final denial of Post's LTD benefits appeal.  There is substantial evidence to support this decision.  The crucial factor in Post's medical history was Dr. Lynch's independent medical examination.  After acknowledging procedural irregularities with regard to notice and the scheduling of Post's FCE, Hartford agreed to postpone its final determination until Post underwent an FCE.  When Post's physicians explained that she would not be able to endure an FCE without risking further injury, Hartford set up a less strenuous IME with Dr. Lynch.  Post agreed.  Dr. Lynch conducted a thorough review of all of Post's medical records and examined Post.  Specifically, Dr. Lynch found that the only diagnosis that prior medical professionals agreed upon for Post was fibromyalgia. When Dr. Lynch examined Post for the presence of the eighteen trigger points usually associated with fibromyalgia, Post did not have any.  Dr. Lynch also determined that Post "has chronic pain disorder with major psychological components" and concluded that the her psychological issues might be responsible for her complaints of widespread pain.  (HLI01069).  He concluded that Post's disability is based upon her subjective complaints, was unsupported by the evidence, and that Post is capable of performing sedentary to light work.

Post's prior medical history also supports Dr. Lynch's conclusion.  In October, 1994, Dr. Fiore concluded that Post "is not disabled."  In July, 1996, Dr. Harris found that Post was capable of handling sedentary work.  Finally, after examining the medical records, Dr. Malievskaia concluded that Post is capable of performing sedentary to light work on a full-time basis.  These opinions, in conjunction with Dr. Lynch's independent medical exam provided Hartford's plan administrator with substantial evidence to determine that Post was not Totally Disabled as

24

defined by the Plan.  Under the heightened arbitrary and capricious standard of review, I am not in a position to substitute my judgment for that of the Plan administrator.  Therefore, I must uphold Hartford's decision to deny Post LTD benefits.

By determining that Post was not Totally Disabled, Hartford's plan administrator implicitly rejected the opinions of Post's treating physicians, Drs. Britton and Munves.  With Post's extensive medical history, conflicts in the medical record are expected.  An ERISA plan administrator does not abuse its discretion when it resolves conflicts in the medical records and concludes that a claimant is not disabled.  Nichols v. Verizon Communications, No. 02-3532, 2003 U.S. App. LEXIS 21207 (3d Cir. Oct. 20, 2003) (upholding benefit determination where administrator resolved conflict between treating physician and independent reviewing physician).  However, as Post's treating physician for the majority of the time period between 1995 and 2003, I find Dr. Britton's determination that Post was disabled and unable to work very persuasive.  Regardless, the relevant issue is not whether I would have found differently than the Plan administrator, but whether Hartford's plan administrator was permitted not to give these treating physician's opinions controlling weight.  It was.  Once again, as the Supreme Court stated in Black & Decker:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.  But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Black & Decker, 538 U.S. at 823-24.  Here, the Plan administrator did not arbitrarily refuse to credit Post's reliable evidence.  Instead, it delayed making its final judgment until Post had

undergone an independent medical examination from Dr. Lynch.  It then credited Dr. Lynch's determination, along with other doctor's opinions, rather than the treating physicians who determined that Post was Totally Disabled.  Therefore, Hartford's denial of Post's disability benefits was not arbitrary and capricious.

**B.**     **Section 502(a)(2)**

Post's Section 502(a)(2) ERISA claim is that Hartford breached the fiduciary duty it owed to Post.  As a preliminary matter, Hartford argues this claim is barred by the doctrine of res judicata (claim preclusion) because I previously dismissed Post's 502(a)(2) ERISA claim on December 6, 2002.  I agree.

The United States Supreme Court has observed that res judicata "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979).   In order for claim preclusion to be met, three elements must be present, (1) a final judgment on the merits must have been rendered in a prior suit; (2) the same parties or their privies are involved; and (3) the subsequent suit is based on the same cause of action as the original.  Lubrizol Corp. v. Exxon Corp., 929 F.2d 960, 963 (3d Cir. 1991). Hartford and Post agree that the second and third prongs are satisfied, but they disagree about whether "a final judgment on the merits" has been rendered.  A dismissal for failure to state a claim under Civil Rule 12(b)(6) is a "judgment on the merits" for purposes of res judicata doctrine.  Federated Dept. Stores v. Moitie, 452 U.S. 394, 399 n.3 (1981); Cramer v. General Tel. & Electronics Corp., 582 F.2d 259, 266-67 (3d Cir. 1978).

A final judgment on the merits of this clam has already been rendered in this suit.  In

April, 2002, Post alleged a breach of fiduciary duty under Section 502(a)(2). I dismissed that claim by stating:

> 'Plan participants or beneficiaries may sue a plan fiduciary for breach of a fiduciary duty pursuant to § 1132(a)(2).' (citations omitted). However, '[t]hey may not do so . . . to obtain individual relief but only for the benefit of the plan.' (citations omitted). . . . 'ERISA functions to prevent possible misuse of plan assets, and its remedies function to protect the entire plan. . . . [Post's] Complaint relate[s] to her alleged entitlement of benefits and clarification of her rights under the Plan. Therefore, [Post's] claim is based upon an allegedly wrongful denial of her disability benefits in contravention to the Plan itself. . . . [A] simple denial of benefits claim cannot form the basis of a suit for breach of fiduciary duty to the Plan itself.'

Post v. Hartford Life and Accident Ins. Co., No. 02-1917, 2002 U.S. Dist. LEXIS 23384, at *6-7 (E.D. Pa. Dec. 6, 2002) (quoting Mose v. U.S. Health Care Sys. of PA, Inc., No. 95-6553, 1996 U.S. Dist. LEXIS 9913, at *2 (E.D. Pa. July 9, 1996).

Post argues that her Section 502(a)(2) claim should be allowed because it differs from her 2002 claim in two ways. First, she cites Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1299 (3d Cir. 1993) for the proposition that ERISA allows individuals to recover directly under a Section 502(a)(2) claim. Post is incorrect. Bixler holds that recovery to an individual for breach of a fiduciary duty is only available under Section 502(a)(3) of ERISA, not Section 502(a)(2). Bixler, 12 F.3d at 1298. As I stated in 2002, by asserting a cause of action on Section 502(a)(2), Post may only recover for the benefit and protection of the entire plan.

Second, Post argues that she is not simply alleging a simple denial of benefits, but that Hartford violated its fiduciary duty in the administration of the plan. (Pl.'s Opp. Mem. 21). According to Post, Hartford committed the following malfeasance constituting a violation of its

fiduciary duty owed to Plaintiff: 1) in 1998 Hartford attempted to take an offset to Post's LTD benefits for the Social Security Disability benefits she was receiving; 2) Hartford requested her tax returns from 1995-1999 to offset from Post's LTD benefits "all other income from any employer or from any work" as stipulated by the Plan; 3) Hartford terminated her LTD benefits because she refused to undergo a FCE; 4) Hartford could not locate Post's file and did not have a copy of the Plan booklet; and 5) Hartford attempted video surveillance of Post.

Unfortunately for Post, she made a similar contention in 2002 by arguing that her Complaint was not a simple denial of benefits because it included "over fifty factual allegations detailing the malfeasance of Defendant in the administration of the Plan."  (Pl.'s Mem. Law. Contra Def.'s Mot. To Dismiss at 3).  Once again, Post does not allege any harm to the entire Plan, only harm to herself, which ultimately resulted in her being denied benefits.  On December 6, 2002, I found that her Section 502(a)(2) claim failed because it only alleged harm to herself and not to the entire Plan.  My dismissal of her Section 502(a)(2) claim on December 6, 2002 was a final judgment on the merits.  Therefore, Post's current Section 502(a)(2) claim for breach of a fiduciary duty is barred by the doctrine of res judicata or claim preclusion.

## IV.  <u>CONCLUSION</u>

For the aforementioned reasons, summary judgment will be entered in favor of Hartford. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
|   :   |
| CAROL A. POST,      :      CIVIL ACTION |
|   :   |
| Plaintiff,      :   |
|   :   |
| v.      :      No. 04-3230 |
|   :   |
| HARTFORD INSURANCE      :   |
| COMPANY,      :   |
|   :   |
| Defendant.      :   |
_____:

## ORDER

     **AND NOW**, this 5th day of October, 2005, upon consideration of Defendant's

Motion for Summary Judgment (Doc. No. 34), the Response and Exhibits attached thereto, it is

hereby **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**, and

judgment is entered in favor of defendant, Hartford Insurance Company, and against plaintiff,

Carol A. Post.

BY THE COURT:

_____
Robert F. Kelly                    Sr. J.