**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| | : | |
| CAROL A. POST, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 04-3230 |
| | : | |
| HARTFORD INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | |

_____:

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                      **OCTOBER 2, 2008**

Carol A. Post ("Post") brought this action against Hartford Insurance Company

("Hartford") alleging that Hartford violated her rights under the Employee Retirement Income

Security Act, 29 U.S.C. § 1001 et seq. ("ERISA") when they decided that she was no longer

"Totally Disabled" as defined by their long-term disability insurance plan.  Presently, before us

is a remand from the Court of Appeals from a reversal, in part, of a grant of a Motion for

Summary Judgment for Hartford.  For the reasons which follow, upon remand, Hartford's

Motion for Summary Judgment is denied, and judgment is entered in favor of Post.

**I.        BACKGROUND**

**A.        The Overlook Hospital Association Long Term Disability Benefit Plan**

Post worked as both a dentist and a pharmacist for the Overlook Hospital Association.

Post participated in a group long-term disability ("LTD") benefit plan created by Overlook

Hospital Association with Hartford as the insurer.  Hartford's Plan explicitly gives its

1

administrator the discretionary authority to determine eligibility for benefits and to interpret all

"terms and provisions of the Group Insurance Policy." Hartford both funds and administers the

benefits of the Plan. Under the Plan:

> Totally Disabled means that: (1) during the Elimination Period; and (2) for the
> next 24 months, you are prevented by Disability from doing all the material and
> substantial duties of your own occupation. After that, and for as long as you
> remain Totally Disabled, you are prevented by Disability from doing any
> occupation or work which you are or could become qualified by: (1) training; (2)
> education; or (3) experience.

(HLI00005). The Plan also provides that Hartford can terminate benefits for, among other

reasons, failure of the claimant to offer proof of a continued disability or refusal to submit to an

examination required by Hartford. (HLI00023). The monthly benefit paid under the Plan is

offset by the amount of any "other income from any employer or for any work" paid to the

claimant, as that term is defined in the Plan. (HLI00027). Post voluntarily contributed to this

LTD benefit plan and was eligible to receive benefits under it on January 1, 1993.

**B. Post is Granted Benefits**

On October 20, 1993, Post had major dental surgery that kept her out of work for five

weeks. (HLI01092). On November 27, 1993, just a few days after returning to work, Post was a

passenger in a car that was rear-ended and pushed into traffic where two more motor vehicles

collided with it. (HLI00764).

Post was seen and treated at the North Jersey Health & Pain Relief Center. On May 10,

1994, Carol N. Cote, Director of Physical Therapy at this center, reported that Post's symptoms

were "consistent with traumatic cervical thoracic and lumbar strain with secondary dysfunction

involving the entire upper and mid cervical as well as the thoracic and lumbar spine. She also

has a posture syndrome which is perpetuated by the dysfunction and muscle strain."(HLI00454-

57).

Post returned to work again in January 1995.  On March 15, 1995, Gregory J. Mulford, M.D., a specialist in rehabilitative medicine, determined that Post "will continue with her attempts at working full-time, but if her pain persists she may be forced to look at long-term disability as an option." (HLI00986).  Post attempted to work as a pharmacist, but stopped working on May 24, 1995, due to pain caused from intractable cervical pain and lumbar radiculopathy.[1]  (HLI01299).

Post was subsequently treated at New York Presbyterian Hospital by a number of physicians, including Dr. Mulford and neurologist, Carolyn D. Britton, M.D.,.  In several reports and Physical Capacity Evaluation forms over the course of the next two years, Dr. Britton diagnosed Post with "chronic, persistent and severe cervical pain," and opined that she was disabled from all types of work. (HLI00945-46; HLI01017; HLI00956-57; HLI000952).  Likewise, during this time period, Dr. Mulford determined that Post continued to have pain in the upper cervical spine, which rendered her unable to return to her previous job.  (HLI00981-82).[2]

On April 26, 1996, Post completed a Total Disability Claim indicating that she was totally disabled because, as a result of the accident, she was suffering from cervical sprain/strain,

---

[1]Radiculopathy- a disease of the nerve roots.  Dorland's Illustrated Medical Dictionary, Twenty-eighth Edition, at1404 (1994) ("Dorland's").

[2]The reports of Drs. Britton and Mulford, as well as Post's other examining physicians, will be discussed in more detail, infra.

3

severe chronic myofascial[3] pain syndrome, cervical facet joint arthropathy[4] and occipital and suboccipital neuralgia.[5]  (HLI01012-23).  On March 24, 1997, Hartford wrote Post informing her that her claim for LTD benefits was approved, effective November 21, 1995 through December 13, 1997.  (HLI00895-98).  Hartford also informed Post that, in order to qualify for benefits beyond December 6, 1997, she would be required to meet the Plan definition of "Total Disability" because that was the date when the Elimination Period plus 24 months was over.  Hartford also informed Post that it had changed the definition for "Total Disability"from that of being prevented from performing her own occupation, to being prevented from performing any occupation.  (HLI00895-96; HLI00005).

Subsequent to Hartford's determination, Post continued to be treated by Dr. Britton throughout the rest of 1997 and through 2000.  Dr. Britton continued to opine that Post's condition remained unchanged, and that she was disabled from all gainful employment.  (HLI00886-87; HLI00866; HLI00817-18).  Post was also examined and treated by several other physicians from May 1997 through 2002, including Dr. Ellen Field-Munves, M.D., a rheumatologist, (HLI00746-48), Russell J. Rentler, M.D., Andrew G. Kaufman, M.D., and Russell K. Portenoy, M.D.  (HLI01223-1224, HLI01217-1220, HLI01211- 01213).[6]

In early 2000, Hartford began to investigate whether Post continued to be disabled.  This

_____

[3]Myofacial- pertaining to or involving the fascia surrounding and associated with muscle tissue.  Dorland's at 1092.

[4]Arthropathy- any joint disease.  Dorland's at 141.

[5]Neuralgia- pain extending along the course of one or more nerves.  Dorland's at 1127.

[6]On September 28, 1998, the Social Security Administration notified Post that she had been awarded Social Security disability benefits.  (HLI00540-542).  This will also be further discussed, infra.

investigation included a surveillance of Post's home which proved unsuccessful as it was reported to Hartford that "claimant was not observed leaving her home." (HLI00793). It also included efforts to obtain Post's tax records from 1995 to 1999, and a Claimant Questionnaire. (HLI00793).

In June 2001, Hartford also attempted to have a third party, Empire Medical Management, set up a Functional Capacity Evaluation ("FCE") to evaluate Post's claim for continued benefits. (HLI01048-49). The parties disagree on whether Post refused the FCE. Hartford claims it instructed Empire Medical to make arrangements through Post's lawyer, (HLI00314), and that its efforts were rebuffed by Post's lawyer, who claimed Post had not agreed to submit to an FCE. (HLI00059-60). Post claimed that she never refused to undergo an FCE, nor was she under an obligation of the LTD policy to schedule one. Nonetheless, Empire Medical Management notified Hartford on June 18, 2001, that Post refused to submit to the FCE. (HLI01282-83).

Thereafter, Hartford directed that Post's medical records be reviewed by Ekaterina Malievskaia, M.D., an Associate Medical Director of the Medical Advisory Group ("MAG"). After a review of the records, Dr. Malievskaia concluded that she "found no objective evidence substantiating this claimant's inability to perform sedentary to light occupation." (HLI01303).

**C.    Hartford Terminate's Post's LTD Benefits, Post Appeals and is Denied**

On January 4, 2002, Hartford terminated Post's LTD benefits because she was "no longer Totally Disabled as defined and is no longer eligible for benefits under this policy." (HLI01240-46; HLI01281). Hartford cited the medical record, Dr. Malievskaia's report, and its assumption

5

that Post refused to undergo an FCE, as evidence that she was no longer disabled.  Hartford

concluded that Post was capable of sedentary to light work, and that the Dictionary of

Occupational Titles lists both Pharmacist and Dentist as light work.   (HLI01240-46).

On January 10, 2002, Post appealed Hartford's decision to terminate her benefits.

(HLI01279).  Post disagreed with the medical record and the finding that she had refused to

submit to an FCE.  On January 13, 2002, Russell J. Rentler, M.D., Post's then-treating general

physician, sent a letter to Hartford stating:

> This letter is in regards to my patient Dr. Carole Post.  As you know, she has been
> on long-term disability due to a chronic illness stemming from an automobile
> accident.  She suffers from a myofascial pain syndrome, chronic fatigue syndrome
> and chronic headaches.  She has been on multiple narcotics and is currently
> unable to function in any work capacity due to her severe disabling symptoms.
> She has seen multiple specialists including neurologists, orthopedists, physiatrists,
> and pain management specialists who have all concurred with her diagnoses.  It is
> my understanding that you have requested she undergo a functional capacity test.
> I strongly recommend that she cannot undergo this test since it will exacerbate her
> symptoms.  The patient recently attempted to clean her window and was [at] my
> office later with severe upper extremity pain and weakness.  The date of that visit
> was December 17 of this year.  I hope this information has been helpful to you
> and will clarify my reasoning for why this patient need not undergo further testing
> of her functional capacities.

(HLI01278).

On March 25, 2002, Hartford upheld its termination of Post's LTD benefits.  Hartford

gave no weight to Dr. Rentler's letter stating that it was inconsistent with his contemporaneous

notes. (HLI01238).  Once again, Hartford found that the medical evidence showed that Post no

longer met the policy definition of total disability.  (HLI01238).  Given that Post raised concerns

that Hartford failed to provide written notification of its intent to have her undergo an FCE, and

because there was confusion over who was responsible for arranging the evaluation, Hartford

agreed to arrange for Post to undergo an examination, and agreed to consider the results of such

to determine whether Post continued to be eligible for LTD benefits.  (HLI01239).

Post's next step was to file a Complaint with this Court on April 8, 2002.   Ultimately, the case was dismissed without prejudice by stipulation of the parties.  Among other conditions, the parties agreed that Post would be given an additional appeal, conditioned on her producing all her additional medical records and submitting to a FCE.  Afterwards, Hartford would determine whether an Independent Medical Evaluation ("IME") and/or an Independent Medical Review would be necessary.  Following the settlement, Post informed Hartford that her doctors would not give her a prescription for an FCE because this type of examination would exacerbate her symptoms.  Therefore, the parties agreed to allow Post to undergo an IME in place of the FCE.

**D.     Post Undergoes an IME, and Hartford Denies Post's Appeal Again**

On August 14, 2003, Christopher G. Lynch, M.D., conducted an IME of Post. (HLI01083-88).  Dr. Lynch did not find objective evidence to support total disability, but instead found that Post's apparent disability was based totally upon her subjective complaints. According to Dr. Lynch, the objective medical evidence was not consistent with Post's reported level of impairment, and he concluded that she could perform sedentary or light work. (HLI01087).  On October 2, 2003, Hartford upheld its decision to terminate Post's benefits, effective January 4, 2002, based on the IME conducted by Dr. Lynch.  (HLI01068).

Post filed this action in the Court of Common Pleas of Lehigh County, Pennsylvania on or about June 17, 2004.  Hartford removed it to this Court on July 8, 2004.  Post filed a Motion to Remand on August 13, 2004, which was voluntarily withdrawn by stipulation of the parties on September 21, 2004.   The parties also agreed to allow Post to amend her Complaint.  Post filed

an Amended Complaint on October 15, 2004.  Post filed a Second Amended Complaint on

March 10, 2005 alleging that Hartford violated Sections 502(a)(1)[7] and 502(a)(2)[8] of the

Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA").   Hartford filed

a Motion for Summary Judgment on June 17, 2005.

## II.    COURT DECISIONS

### A.    This Court's Prior Decision

Deciding Hartford's Motion for Summary Judgment required us to consider two

standards of review: the summary judgment standard pursuant to Federal Rule of Civil Procedure

56, and the arbitrary and capricious standard under ERISA.  Byrd v. Reliance Std. Life Ins. Co.,

2004 U.S. Dist. LEXIS 24682, at *6 (E.D. Pa. Dec. 7, 2004).  Where, as here, a plan governed

under ERISA provides the administrator with discretionary authority to determine benefit

eligibility, we were required to review the determination under an arbitrary and capricious

standard.  See, e.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111-12 (1989).

Under the arbitrary and capricious standard, we could not reverse the administrator's

decision denying disability benefits, unless that decision was "without reason, unsupported by

substantial evidence[,] or erroneous as a matter of law."  Abnathya v. Hoffmann-LaRoche, Inc.,

2 F.3d 40, 45 (3d Cir. 1993).  The scope of this review is narrow, and we were not free to

substitute our own judgment for that of Hartford's plan administrator in determining eligibility

---

[7] Section 502(a)(1) provides that "a civil action may be brought . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

[8] Section 502(a)(2) provides that "a civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary" for appropriate relief when a fiduciary violates his duties under ERISA.  29 U.S.C. §§ 1132(a)(2); 1109.

for plan benefits.  Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997).

However, Courts presume a conflict of interest because the insurance company is presumed to have "an active incentive to deny close claims in order to keep costs down and keep themselves competitive so that companies will choose to use them as their insurers."  Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 388 (3d Cir. 2000).  Therefore, a "heightened arbitrary and capricious standard of review" was applicable where, as here, an insurance company determines the eligibility for benefits and also pays benefits out of its own funds.  Id.

Under this heightened standard, Pinto held that we were to apply a sliding scale that takes into consideration the degree of conflict on the part of the administrator- the greater the evidence of conflict, the greater the scrutiny.  Id. at 389.  Utilizing this sliding scale, we were to evaluate the presence and severity of several factors related to the conflict: (1) sophistication of the parties; (2) information accessible to the parties; (3) exact financial arrangement between the insurer and the company; and (4) the status of the administrator, as the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction.  Pinto, 214 F.3d at 392.  Procedural anomalies, biases, or unfairness in determining the level of scrutiny applied to an administrator's decision were also to be evaluated.  Id.

We considered the four factors as listed above and determined that Hartford had a slightly heightened conflict of interest in determining Post's eligibility for LTD benefits. Specifically, we determined that only the third factor was subject to arbitrary and capricious standard- the exact financial arrangement between the insurer and the company.  The Plan is funded by Hartford on a case-by-case basis instead of a fixed price basis that has been actuarially determined.  It is possible, then, for Hartford to have some incentive to deny coverage on

9

individual requests, assuming that it has no interest in "avoiding the loss of morale and higher wage demands that could result from denials of benefits."  Nazay v. Miller, 949 F.2d 1323, 1335 (3d Cir. 1991). Thus, we found that the third factor mandated only a slightly heightened standard.  Post v. Hartford Ins. Co., No. 04-3230, 2005 WL 2455818, at *11 (E.D. Pa. Oct. 5, 2005).

We then went on to consider evidence of procedural anomalies, bias, or unfairness. Pinto, 214 F.3d at 394.  Where courts have found evidence of procedural anomalies, bias, or unfairness, significantly greater scrutiny has been applied to the administrator's decision.  Id.

We proceeded to look at four procedural anomalies[9] and determined that, in the aggregate, they amounted to "minor procedural irregularities indicating possible bias against Post."  Id.  We, therefore, concluded that we would "employ a moderate level of scrutiny" when analyzing the administrator's decision.  Post v. Hartford Ins. Co., 2005 WL 2455818, at *13.

Applying this "moderately heightened arbitrary and capricious standard," we determined that Hartford's final decision to deny Post's LTD benefits was supported by substantial evidence, and therefore, we concluded that Hartford's denial of Post's disability benefits was not arbitrary and capricious.  Id. at 15.

Post appealed this decision to the Third Circuit, on November 2, 2005, and the Court

_____

[9]The four procedural anomalies were:

    1. Hartford's attempt to offset Post's LTD benefits with Social Security Disability benefits;
    2.  Post's refusal to undergo an FCE;
    3.  The opinion of non-treating physician, Dr. Malievskaia; and
    4.  Hartford's surveillance of Post.

issued its decision on April 15, 2008, affirming our decision in part,[10] vacating it in part, and remanding this matter back to this Court for further proceedings consistent with its decision.

**B.      The Third Circuit's Decision**

On appeal, the Court in <u>Post v. Hartford Ins. Co.</u>, 501 F.3d 154 (3d Cir. 2007) first noted the Supreme Court's holding in <u>Firestone Tire & Rubber Co. v. Brunch</u>, <u>supra</u>. at 113.  <u>Firestone</u> held "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor' in determining whether there is an abuse of discretion." <u>Post</u>, 501 F.3d at 161.

The Court wrote that in the post-<u>Firestone</u> era, most courts of appeal have adopted a "sliding scale" standard of review.  "This approach grants the administrator deference in accordance with the level of conflict.  Thus, if the level of conflict is slight, most of the administrator's deference remains intact, and the court applies something similar to traditional arbitrary and capricious review; conversely, if the level of conflict is high, then most of its discretion is stripped away." <u>Id</u>.  As a result of <u>Firestone</u>, this Circuit adopted the sliding scale approach in <u>Pinto</u>, <u>supra</u>., holding that we find that the sliding scale approach was most faithful to <u>Firestone's</u> command that the level of conflict be considered as a "factor" in shaping arbitrary and capricious review.  <u>Id.</u> at 392.

The Court further stated that:

> [T]he premise of the sliding scale approach is that courts should examine benefit denials on their facts to determine whether the administrator abused its discretion. To apply this approach, courts first consider the evidence that the administrator acted from an improper motive and heightened their level of scrutiny

---

[10]The Court affirmed our decision granting summary judgment on the §1132(a)(2) claim because principles of *res judicata* barred that claim.

appropriately.   Second, they review the merits of the decision and evidence of impropriety together to determine whether the administrator properly exercised the discretion accorded it.  If so, its decision stands; if not, the court steps into the shoes of the administrator and rules on the merits itself.

Post, 501 F.3d at 161.  The Court also noted that "[D]etermining how to apply heightened arbitrary and capricious review requires considering both structural and procedural factors." "The structural inquiry focuses on the financial incentives created by the way the plan is organized, whereas the procedural inquiry focuses on how the administrator treated the particular claimant."  Id. at 392-393.

Furthermore, Pinto held that "structure alone can require heightened review." Id. at 390. As Post stated that the administrator in the present case, Hartford, was an outside insurer that makes claims' decisions itself, and that this is the very sort of conflict that Pinto declared to be substantial and worthy of raising the standard of review.  Thus, the Court determined that this was sufficient to require at least moderately heightened review.  Post v. Hartford Ins. Co., 501 F.3d at 164.

Specifically, the Court held that where courts have found evidence of procedural anomalies, bias, or unfairness, significantly greater scrutiny has been applied to the administrator's decision.  Id.  Examples of procedural anomalies include an administrator who:

> (a) relies on the opinions of non-treating physicians over those of treating physicians without explanation, Kosiba v. Merck & Co., 384 F.3d 58, 67-68 (3d Cir. 2004); (b) fails to follow the plan's notification provisions and conducts self-serving paper reviews of medical files, Lemaire v. Hartford Life and Accident Ins. Co., 69 Fed. Appx. 88 (3d Cir. 2003); (c) bases its negative decision on inadequate information and incomplete investigations, Friess v. Reliance Standard Life Ins. Co., 122 F.Supp. 2d 566, 574-75 (E.D. Pa. 2000); (d) reverses an earlier decision allowing benefits without any new evidence that supports the reversal, Pinto, 214 F.3d at 394; (e) ignores the recommendations of its own claim managers that benefits should be awarded. Id.

12

On the issue of procedural irregularities, <u>Post</u> noted that this Court's finding that "procedural anomalies appear to form a pattern of Hartford being overly aggressive in its attempts to reduce Post's benefits and then attempting to rectify the situation when it realized its error." We named four aspects of the process that appeared irregular, yet we concluded that they were too minor to further heighten our scrutiny. <u>Post v. Hartford Ins.Co.</u>, 2005 WL 2455818 at *12-13. The Circuit, in <u>Post</u>, addressed these four and also considered two other irregularities.

The Court first addressed Hartford's attempt to use Post's Social Security benefits to offset her disability benefits, despite the plan not allowing for such an offset. The Court noted that after Post's attorney protested, Hartford relented, but it was the administrators' responsibility to know the contents of the plan. The Court concluded that because Hartford is a large, sophisticated insurance company, and the Plan its own design, they were less willing to draw benign inferences from Hartford's supposed confusion about the contents of its own contract. <u>Post</u>, 501 F.3d at 166.

Second, the court addressed the issue of Post's alleged refusal to undergo a FCE. The Court stated that Post had not refused the FCE, but that Hartford was quick to conclude that she had, despite never making a written request for her to undergo a FCE. In addition, during the appeals process, Hartford relented and agreed to reconsider her appeal if she would agree to undergo an IME. The Court stated that "[O]f concern is that Hartford did not allow Post to see Dr. Lynch's report before making its final decision to terminate. Thus, she had no opportunity to allow her treating physicians to comment on it. <u>Id.</u>

Third, the Court noted that Hartford's decision to terminate relied heavily on Dr. Malievskaia's report, which was not based on a physical examination. The Court noted that

13

while ERISA does not require that plan administrators give the opinions of treating physicians special weight, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 823-24 (2003), courts must still consider the circumstances that surround an administrator ordering a paper review. "On one hand, nothing in the record specifically suggests that Hartford ordered this review in bad faith, as, we assume, periodic reviews are typical in the industry.  On the other hand, we note that at the time of the review the overwhelming weight of evidence in Post's record argued in her favor."  Id.

Fourth, the Court wrote that Hartford continued to investigate her claim despite using surveillance which revealed that she did not leave her home.  The Court pointed out that this was "consistent with, and corroborative of her claim of disability.  Yet, Hartford was undeterred in continuing to pursue evidence that Post was not disabled.  Indeed, the very fact that its employees characterized the results of the surveillance as 'unsuccessful' suggests that its motive was to find evidence to deny Post's claim." Id. at 167.

The Court also found that Hartford's pursuit of Post's tax returns "in the face of ambiguous Plan language" which required Post to produce such and threatening forfeiture of her benefits is "accurately characterized as an aggressive tactic."  Id.

The Court concluded that "[I]n this case, the sheer number of irregularities coupled with Hartford's aggressive posture raise concerns, and so the standard of review must be heightened. This procedural posture suggests we move toward the high end of the sliding scale."  Id. at 168.

**C.     Subsequent Supreme Court Decision**

Just weeks after the Post decision was handed down, the United States Supreme Court revisited the issue of conflicts of interest in ERISA actions. See Metropolitan Life Co. v. Glenn,

128 S.Ct. 2343 (2008).   In this case, the Court stated that its decision was an "elucidation"of the

Firestone standard.  Id. at 2353.  (emphasis added).   The Court first noted that it held in

Firestone that a conflict should "be weighed as a 'factor' in determining whether there is an

abuse of discretion." 489 U.S. at 115.  The Court explained that  "[W]e do not believe that

Firestone's statement implies a change in the standard of review, say, from deferential to de novo

review."  Metropolitan, 128 S. Ct. at 2350.  "Nor, would we overturn Firestone by adopting a

rule that in practice could bring about near universal review by judges de novo."  Id.  The Court

added that "[H]ad Congress intended such a system of review, we believe it would not have left

to the courts the development of review standards but would have said more on the subject."  Id.

> Neither do we believe it necessary or desirable for courts to create special burden-
> of-proof rules, or other special procedural or evidentiary rules, focused narrowly
> upon the evaluator/payor conflict.  In principle, as we have just said, conflicts are
> but one factor among many that a reviewing judge must take into account.
> Benefits decisions arise in too many contexts, concern too many circumstances,
> and can relate in too many different ways to conflicts- which themselves vary in
> kind and in degree of seriousness- for us to come up with a one-size-fits-all
> procedural system that is likely to promote fair and accurate review.  Indeed,
> special procedural rules would create further complexity, adding time and
> expense to a process that may already be too costly for many of those who seek
> redress.

Id. at 2351.

The Court further explained that "[W]e believe that Firestone means what the word

'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will

often take account of several different considerations of which a conflict of interest is one."  Id.

at 2351.  The Court added that "[I]n such instances, any one factor will act as a tiebreaker when

the other factors are closely balanced, the degree of closeness necessary depending upon the tie

breaking factor's inherent or case-specific importance."  Id. at 2351.  The Court went on to state

that a conflict of interest should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.  "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."  Id.

## III.  DISCUSSION

### A.  Standard of Review

The first question we must address is whether the Metropolitan decision overturned and/or changed the "sliding scale" standard of review for a conflict of interest in ERISA actions. Our Circuit has not yet ruled on the effect of Metropolitan on the sliding scale standard, and our research indicates that only one district court in this Circuit has confronted a conflict of interest case in an ERISA action after the Metropolitan decision.  In Dolfi v. Disability Reinsurance Mgmt. Services, No. 06-1262, 2008 WL 3925847, at *18, n.29 (M.D. Pa. Aug. 21, 2008), the Court determined that whether the sliding scale approach survives Metropolitan need not be resolved by this court since the plaintiff in that action had not shown a conflict of interest.  Id. We are also of the opinion that we do not have to resolve the issue of whether the sliding scale standard survives Metropolitan, since we find that Hartford's decision to terminate Post's benefits was arbitrary and capricious under the directives of both Post and Metropolitan.[11]

---

[11]Even though we are not deciding the issue of whether the "sliding scale" standard survives Metropolitan in the instant case, we do believe that it does.  As noted above, Metropolitan, itself, stated that its decision was an "elucidation"of the Firestone standard, that it was not overturning the Firestone decision, and held that a conflict should be weighed as a "factor" in determining whether there is an abuse of discretion.  Metropolitan, 128 S.Ct. at 2353. In fact, since the Firestone decision, this Circuit has considered a conflict of interest as a "factor" in the arbitrary and capricious review, but implemented the sliding scale approach.  In Pinto, our

We will, thus, follow <u>Metropolitan</u> and consider the conflict of interest here as one factor among several other factors in analyzing Hartford's decision to terminate Post's benefits. Upon consideration of the direction of the Circuit in <u>Post</u> and the holdings in <u>Metropolitan</u>, we find that the conflict of interest in this case, together with the other factors discussed below, support a decision that Hartford's termination of Post's benefits was  arbitrary and capricious.

**B.    Factors Considered Under the Arbitrary and Capricious Standard of Review**

**1.   Lack of New Evidence**

As noted earlier, <u>Pinto</u> stated that where an administrator reverses an earlier decision allowing benefits without any new evidence supporting reversal, a procedural anomaly exists requiring significantly greater scrutiny to the administrator's decision.  <u>Pinto</u>, 214 F.3d at 394.  Here, we are of the opinion that Hartford reversed its decision to grant benefits without any new evidence to support its decision.  Under the sliding scale, this would have mandated significantly greater scrutiny of Hartford's decision.  We, however, consider it as just another factor here, but one that significantly tips the scales in favor of finding Hartford's decision arbitrary and capricious.

In considering this factor, we must first look at the evidence upon which Hartford originally decided to grant benefits on March 24, 1997.  On October 20, 1993, Post had major dental surgery that kept her out of work for five weeks.  (HLI01092).  She resumed working a few days before she was involved in an automobile accident.  (HLI00944).  On November 27, 1993, Post was a passenger in a car that was rear-ended and pushed into traffic where two more

_____

Circuit held that the sliding scale approach was the most faithful to <u>Firestone's</u> command that the level of conflict be considered as a factor in shaping arbitrary and capricious review.  214 F.3d at 392.

motor vehicles collided with it.  (HLI00764).  On May, 10, 1994, Carol N. Cote, Director of

Physical Therapy at the North Jersey Health & Pain Relief Center, summarized her findings as:

> consistent with traumatic cervical thoracic and lumbar strain with secondary
> dysfunction involving the entire upper and mid cervical as well as the thoracic
> and lumbar spine.  She also has a posture syndrome which is perpetuated by the
> dysfunction and muscle strain.  Her symptoms are more acute on the left, which is
> also reflected on the left tempromandibular joint.  She is secondarily relatively
> hypomobile of the right TMJ compared to the left.  She has also had significant
> anterior cervical soft tissue involvement.  (HLI00454-457).

Post returned to work again in January 1995.  On March 15, 1995, Gregory Mulford,

M.D. stated that Post "will continue with her attempts at working full-time, but if her pain

persists she may be forced to look at long-term disability as an option." (HLI00986).  Post

attempted to work as a pharmacist, but stopped working on May 24, 1995, due to pain caused

from intractable cervical pain and lumbar radiculopathy.  (HLI01299).

On June 9, 1995, Post visited her neurologist and treating physician, Carolyn Britton,

M.D., at New York Columbia Presbyterian Hospital.  Dr. Britton noted that for two years Post

had been in physical therapy for treatment of severe, chronic neck pain, and has been unable to

perform her duties as a dentist[12] or pharmacist because of her inability to lift or engage in

repetitive activity.  Dr. Britton diagnosed that Post was suffering from a "whiplash" injury

"resulting in chronic, persistent and severe cervical pain."  (HLI00946).  Dr. Britton opined that

Post was "incapacitated by pain," and noted that her brief attempts to return to work were

---

[12]On June 27, 1996, Overlook employee, Thomas Vogt, completed a Physical Demands
Analysis Form indicating the demands involved for Post as a pharmacist.  On that form, Mr.
Vogt indicated that a pharmacist needs to sit for two hours, and stand and walk for three hours
during an eight hour work day.  According to Mr. Vogt, a pharmacist also needs to lift between
11 and 50 pounds occasionally, but never more than that.  Mr. Vogt indicated that a pharmacist
needs to climb, balance and feel on occasion, as well as stoop frequently and reach and handle
constantly.  Finally, Mr. Vogt classified the job as "medium work."  (HLI00998-99).

unsuccessful because of ongoing pain. (HLI00945).

On November 7, 1995, Dr. Mulford examined Post again and determined that Post "is not yet able to return to any activities that require prolonged sitting or lifting." (HLI00982). Dr. Mulford also explained that, "given persistence of her symptoms and her limitations, I do not believe she is presently able to successfully return to the previous job." (HLI00982).

On March 19, 1996, Dr. Mulford noted that Post was doing relatively well with her home exercises and pain self-management, but also noted that "she continues to have pain primarily in the upper cervical spine, and occasionally into the left upper scapular region" and that "lifting and straining continue to aggravate her symptoms most." (HLI00981). Dr. Mulford further stated that Post's "most significant abnormality on her examination continues to be her cervical range of motion which shows markedly restricted flexion." (HLI00981). Finally, Dr. Mulford offered that "I see no significant change in her examination, compared to previous assessments." (HLI00982).

On April 26, 1996, Post completed a Total Disability Claim indicating that she was totally disabled on the basis that she was suffering from cervical sprain/strain, severe chronic myofascial pain syndrome, cervical facet joint arthropathy and occipital and suboccipital neuralgia as a result of the car accident. (HLI01012-23). Just prior to this time on March 17, 1996, Dr. Britton indicated in an "Attending Physician's Statement of Disability" form completed at the request of Hartford, that Post was suffering from cervical sprain and intractable cervical pain and spasm, which resulted in the subjective symptoms of pain in her neck and stiffness and objective findings of "pain cervical and trapezius spasm; rom cervical spine." Dr. Britton opined that Post became unable to work as of May 25, 1995 and was totally disabled not

19

only from her previous job, but all jobs.  She also noted that her progress was "unchanged." (HLI01017).

Also at the request of Hartford, Joel Harris, D.D.S., completed a Physical Capacities Evaluation Form on July 22, 1996.  Dr. Harris reported that Post had severe pain in her head, neck and lower jaw.  He noted that her severe back pain limits her mobility and that she cannot sit in a chair for treatment purposes without pain.  (HLI00990).  Dr. Harris recommended that Post could stand, sit, walk and drive for one hour each during an eight-hour work day, but she could never lift any amount of weight, climb, balance, stoop, kneel, crawl, crouch, reach, finger, handle, or feel.  He also believed that Post had reached her maximum medical improvement. Despite opining that Post was only able to stand, walk, and sit for one hour each during an eight-hour workday and could never even lift up to ten pounds, Dr. Harris checked off on the evaluation form that Post was capable of handling sedentary work.  Sedentary work was defined on this form as requiring the ability to lift up to ten pounds and being about to do a "certain amount of walking and standing in carrying out job duties."  (HLI00989-990).

On August 24, 1996, Dr. Britton filled out a Physical Capacities Evaluation form on which she reported that Post could sit, stand, walk, and drive for one hour each in an eight-hour day, with rest.  She indicated further that Post could lift up to ten pounds occasionally, but never more.  Dr. Britton concluded that Post was completely disabled.  (HLI00956-957).

On September 16, 1996,  Dr. Britton reported that Post had evaluated in her office for severe chronic post-traumatic cervical pain.  Her examination was "significant for moderate spasm of cervical paraspinals and both trapezil."  Dr. Britton noted that Post's activities were very limited.  Post requires "frequent rest periods and is unable to tolerate any sustained work

activity. She is completely disabled for her usual and any other work." (HLI00952).

Based on this medical evidence, Hartford granted LTD benefits, but as already noted above, ultimately terminated Post's benefits in October 2003 based on an IME conducted by Dr. Christopher Lynch. (HLI01068). Post was given this IME on August 14, 2003. Dr. Lynch reported that Post complained of severe TMJ area pain, upper and lower back, shoulder, neck, trapezius, foot, leg, arm and hand pain, and overall body pain 24 hours-a-day. Medications helped her pain somewhat, but the pain persisted. Trigger point injections helped, but only temporarily. Dr. Lynch noted that Post's self-reports of pain were contradicted by her physical appearance; she appeared to be in no distress although claiming to be in total body pain. (HLI01083-84).

Upon examining Post, Dr. Lynch found that her upper extremities revealed no deformities, there was no focal motor, reflex or sensory loss, and she had a normal pain free range of motion in all her upper extremity joints, including her shoulders. Post did not have tenderness over her forearm or upper arm. (HLI01084).

Examining Post's head, neck and back revealed no deformities, and her range of motion in the cervical spine was 15 to 20 degrees of left and right lateral rotation with normal flexion and extension. Her range of motion in the low back was 60+ degrees of flexion with 5-10 degrees of extension. Dr. Lynch noted:

> Palpation over the cervical and thoracic regions reveals no definite tenderness and no trigger points were palpated. Palpation over the lumbosacral spine reveals no tenderness. She was somewhat tender over the greater trochanters[13] bilaterally. No definite trigger points were noted. Straight leg raising is negative bilaterally. Motor, reflex, and sensory exams were normal in the lower extremities. She has

---

[13]Trochanter- either of the two processes below the neck of the femur. Dorland's at 1748.

normal pain free range of motion in all lower extremity joints.  Gait is normal.

(HLI01084-85).

Dr. Lynch cited Post's first MRI study in December 1993, which was normal.

Thereafter, her treating physicians indicated that subsequent MRI studies showed degenerative

changes in the cervical and lumbar spine with some disc protrusions.  (HLI01085).  Dr. Lynch

recorded that Post received numerous medications, including Oxycontin and Oxy-IR, but she

still complained of chronic total body pain.  She has also had poor responses to multiple

medications, and "despite the increase in Oxycontin and the addition of Oxy-IR, she still has

chronic total body pain, which has really not improved despite the passage of time and increase

in medications."  (HLI01085).  Dr. Lynch did not find objective evidence to support total

disability, but instead found that Post's apparent disability was based totally upon her subjective

complaints.  Dr. Lynch found that the only diagnosis of Post that her treating physicians agreed

upon was that of myofascial pain syndrome, also known as fibromyalgia.  Dr. Lynch explained

that fibromyalgia is defined as the "presence of chronic widespread muscular pain with

associated findings of eleven out of the usually recognized eighteen trigger points."  (HLI0186).

Post, however, did not have any trigger points in her examination, and by reviewing the records,

Dr. Lynch found that she probably had a few trigger points, but no where near the required

eleven.  (HLI01085-87).

According to Dr. Lynch, the objective medical evidence was not consistent with Post's

reported level of impairment.  (HLI01087).  Dr. Lynch concluded that she could perform

sedentary or light work as usually defined, including lifting up to 20 pounds maximum with

frequent lifting or carrying of items up to 10 pounds.  In his opinion, Post had the ability to

22

change posture at "fairly frequent intervals."  Dr. Lynch concluded that Post has a chronic pain

disorder with major psychological components.  He stated that:

> [I]t is my opinion that the multiple treatment over the years which have been
> targeted at physical complaints and using various analgesics, anti-inflammatories,
> physical therapy and other treatments aimed for physical complaints or problems
> will not simply work because I do not believe the major problem here is a truly
> physical problem of myofascial pain or musculoskeletal pain.  She has had more
> than adequate time and treatment for physical myofascial and musculoskeletal
> pain and yet her pain is really no better.  I feel, at this time, further increases in
> further narcotics or changes in narcotics, are not likely to be of any benefit and
> thus, feel they might in fact worsen the cycle of dependency on narcotic
> medication.  I feel the majority of this patient's pain is psychogenic[14] in nature
> and needs to be addressed by appropriate psychiatric and/or psychological means.
> It appears that ten years of physical complaints and ten years of physical
> treatments have not changed this situation much at all.  (HLI01087-88).

In rendering its decision to terminate Post's benefits, Hartford explained that, based on a

review of Dr. Lynch's findings, Post no longer met the definition of "Totally Disabled," and

wrote that "it does not appear that Ms. Post has elected to follow the recommendations of her

treating physicians to seek psychological/psychiatric treatment.  As a result, there is no way to

ascertain Ms. Post's behavioral health, particularly at the time her request for continued LTD

Income benefits were terminated in January 2002."  Given the restrictions and limitations

imposed upon Post by Dr. Lynch, Hartford determined that Post:

> would not be prevented by disability from doing any occupation or work for
> which she is qualified by training, education or experience.  More specifically,
> these restrictions would not prevent Ms. Post from performing the essential duties
> of either a pharmacist or a dentist, occupations [she] engaged in prior to filing her
> disability claim.(HLI01070).

Therefore, Hartford concluded that the medical evidence did not support a condition of

---

[14]Psychogenic- produced or caused by psychic or mental factors rather than organic
factors.  Dorland's at 1383.

total disability as defined by the Plan.

However, a thorough review of the large volume of medical evidence from the date of Hartford's initial determination that she was disabled in March 1997 through the date of its final termination decision in October 2003, indicates that Post's condition had not changed.  In fact, the medical record subsequent to March 1997 clearly corroborates and supports the medical evidence prior to this date, as summarized above.  It is, of course, significant that this was the same evidence upon which Hartford relied in finding Post totally disabled.  The record, therefore, reflects that there was no new evidence on which Hartford could justify terminating Post's benefits.  During the years following March 1997, the record shows that Post continued to see her treating neurologist, Dr. Britton, on a regular basis, was continually treated with narcotic pain medication with minimal results, and sought out treatment with additional specialists for severe pain.  These physicians consistently reported that plaintiff's pain was real and disabled her from all types of work, and that her condition remained unchanged since she was first unable to work in May of 1995 through Dr. Lynch's IME in August 2003.

Soon after Hartford made its determination that Post was entitled to benefits,  Dr. Britton completed a Physical Capacities Evaluation form on April 25, 1997 at Hartford's request.  In such, she found that Post could sit for two hours, stand and walk for one hour, occasionally lift and carry up to ten pounds, occasionally climb, balance, stoop, kneel and reach, but never crouch or crawl.  Dr. Britton opined that Post was "disabled, completely."  (HLI00886-87).  On September 26, 1997, Dr. Britton completed another Physical Capacities Evaluation form, wherein she stated that Post could not perform any degree of work  (HLI00866).

Almost two years later on June 3, 1999, Dr. Britton filled out yet another Physical

24

Capacity Evaluation form at the request of Hartford and actually opined that Post had less capacity to sit, stand, and walk during an eight-hour workday as she had previously reported. Dr. Britton indicated that Post was only able to sit for thirty minutes, and stand and walk for twenty minutes during a workday.  Dr. Britton again concluded that Post had reached "maximum medical improvement," and that she was incapable of performing any type of work.  (HLI00817-18).  On July 25, 2000, Dr. Britton responded to Hartford's request to complete an "Attending Physician's Statement of Continued Disability."  In such, Dr. Britton noted that she had treated Post on this date for pain management and would see her again in four to six weeks.  Dr. Britton opined that Post suffered from intractable cervical spasm and pain, cervical sprain, and neck and lower back pain, and determined that Post has "no improvement" in her ability to stand, walk, and sit, and could only lift less than five pounds.  She further concluded that Post's progress was "unchanged."  (HLI01313-14).

        We recognize that "[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians because there is also a potential conflict of interest on the part of a treating physician who, in a close case, may favor a finding for the patient." Black & Decker Disability Plan v. Nord, supra. at 833.  However, "plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence including the opinions of a treating physician."  Id. at 834.

        Here, Hartford based its decision to terminate benefits solely on the examination and opinion of Dr. Lynch.  However, Hartford failed to give any credit to the reports and opinions of not only Post's treating physician, Dr. Britton, but several other physicians who treated Post and gave opinions concerning her ability to work.  In his report, Dr. Lynch makes no mention of Dr.

25

Britton, or any other examining and/or treating physicians, such as Dr. Ellen Field-Munves and

Dr. Russell Rentler.  Instead, he simply wrote that the only diagnosis that was agreed upon by

her treating doctors was myofacial pain syndrome.  In addition, Dr. Lynch did not discuss or

attempt to discredit any of the physical limitations that several of Post's doctors had found, and

offered no opinion, himself, as to her physical capabilities, other than to conclude that her pain

was basically imaginary.  (HLI01083-88).

On May 1, 1997, Post was examined by Ellen Field-Munves, M.D., a rheumatologist,

who reported that Post had chronic pain syndrome and fibromyalgia that limited her range of

motion of the neck.  Dr. Field-Munves concluded that "[a]t present this [patient] is totally

disabled from any occupation."  (HLI00746-48).  Also, during this time, Post was being treated

by Dr. Rentler.  On July 12, 1999, Dr. Rentler reported that he was seeing plaintiff for her

ongoing musculoskeletal problems.  He stated that Post has continued pain that goes down into

her legs, and that she is "very weak" and fatigued.  He diagnosed her with "chronic

musculoskeletal condition secondary to TMJ syndrome secondary to trauma."  He suggested

continued physical therapy, stating that it was the only thing that was giving her relief.

(HLI01255).  Dr. Rentler reiterated on August 9, 1999, that plaintiff had a lot of fatigue and

continued pain (HLI01255).  He saw Post again on November 22, 1999, and noted that Post was

"clearly" in pain, despite the reports of the prosthodontist that she saw for pain in Boston who

told her that her EMG was normal, and that she should not be in severe pain.  He continued her

on the medications, Flexeril and Oxycontin, and recommended that she see a counselor to help

her deal with her chronic pain syndrome.  (HLI01254).

Post was also treated from May 23, 2000 through September 17, 2002 by a pain

specialist, Andrew G. Kaufman, M.D., of Summit Pain Management.  On May 23, 2000, Dr.

Kaufman noted that Post sought out his help after she had seen him at a speaking engagement in

Princeton, New Jersey.  Dr. Kaufman initially assessed Post's condition as "diffuse myofascial

pain, status post MBA with cervical strain, and occasional cervicogenic headache."  Contrary to

the findings of Dr. Lynch, concerning her lack of trigger points for fibromyalgia, Dr. Kaufman

found several trigger points in the C-5, C-6 level and the infraspinatous region on her left side.

At Dr. Kaufman's direction, Post was given four injections into these regions, witch gave her

some immediate pain relief.  (HLI01223-24).  Post saw Dr. Kaufman next on July 7, 2000.  He

reported "improving myofacial pain syndrome," but continued her on the narcotic drugs,

Oxycontin and Oxycodone. (HLI01221).  On October 2, 2000, Dr. Kaufmann wrote that Post

was suffering with migraine headaches and that she had recurrent myofacial pain.  (HLI01220).

Dr. Kaufman reported on March 16, 2001 that Post reported more of a total body ache

than the usual trigger injections and that she continued taking Oxycontin and Oxycodone.

(HLI01219).  Post next saw Dr. Kaufman several months later on November 12, 2001, and he

indicated that Post was "still profusely achy all over her head, neck, shoulders, mid back and low

back."  He also noted that Post expressed great dissatisfaction with the fact that she is no longer

able to "function at a higher level" and to "even take care of her family much less attempt to

work."  Post was again given some trigger point injections to diminish her pain.  (HLI01217-18).

Dr. Kaufman next saw Post on May 31, 2002, and wrote that plaintiff was continued on

Oxycontin and Imitrx for migraines, and the buttock area was the major area for her myofacial

pain.  Post received an injection for pain in that area.  Dr. Kaufman's assessment was again

myofacial pain, fibromyalgia, and migraine headache.  (HLI01213).  Post last saw Dr. Kaufman

on September 12, 2002 when he reported that Post complained of increasing pain in the neck as well as intermittently down the arms, and generalized pain in the in the back and buttock.  He added that there were two significant trigger regions in the gluteal muscle which reproduced significant pain in the buttock.  Dr. Kaufman noted that Post asked for an increase in her narcotics, but he did not agree to this until he did further testing.  He also recommended that she see a headache specialist.  (HLI01211- 12).

On October 20, 2002, Post was examined by Russell K. Portenoy, M.D., Chairman of the Department of Pain Medicine and Palliative Care of Beth Israel Medical Center in New York.  He noted that plaintiff had been through numerous prior therapies to help her pain.  She had trials of the drugs, Flexeril, Vioxx, Lorcet, Elavil, Clonidine, Pamelor, Zoloft, Neurontin, and Zanaflex, and that none of these medications provided benefit at doses that could be tolerated.  Post also had physical therapy for four years which worsened the pain, and had chiropractic manipulation, acupuncture, yoga training, biofeedback training, trials of TENS, and injections.  None of which, however,  helped the pain.  Dr. Portenoy also stated that Post was being treated with an opioid regimen, specifically, Oxycontin, which offered only moderate benefit.  Dr. Portenoy summarized that Post "has a long standing chronic pain syndrome compromising a chronic posttraumatic vascular headache, a posttraumatic idiopathic pain involving most of the body and abdominal pain also of unclear cause but consistent with irritable bowel syndrome.  The pain is associated with a very high level of disability."  (HLI01197-99).

It is significant to note here that Dr. Lynch, himself, recognized that Post's condition over the last ten years had not changed at all.  He acknowledged that Post had been treated with various physical treatments, including the continued use of narcotic pain medication.  He stated

28

that Post has had poor responses to multiple medications, and "despite the increase in Oxycontin and the addition of Oxy-IR, she still has chronic total body pain, which really has not improved despite the passage of time and increase in medications." (HLI01085). Moreover, it is significant that despite the fact that Post was treated over the previous ten years by various physicians, including specialists in rheumatology and pain management, that Dr. Lynch after his sole examination of Post, determined that Post's pain was psychogenic in nature. There is simply no evidence in this voluminous medical record to support such a conclusion. In fact, the record reflects that between 1993 and 2003, Post visited 14 doctors, and only Dr. Lynch concluded that Post's pain syndrome was psychogenic. For these reasons, this factor itself is sufficient to find that Hartford's decision to terminate benefits was arbitrary and capricious. We will, however, discuss two additional factors which support this determination.

###    2.    Post's Award of Social Security Disability Benefits

We next find that Post's award of Social Security benefits, and Hartford's failure to address such, is another factor that indicates that Hartford's decision to terminate benefits was arbitrary and capricious. As earlier noted, on September 28, 1998, the Social Security Administration notified Post that she had been awarded Social Security disability benefits. (HLI00540-542). While our Circuit has not ruled on the relevance of Social Security decisions in determining the appropriate standard of review, other courts of appeals and some district courts have held that a disagreement with the Social Security Administration is a relevant, though not dispositive factor. See Glenn v. MetLife Inc., 461 F.3d 660, 669 (6th Cir. 2006). ("[A]n Erisa plan administrator's failure to address the Social Security Administration's finding that a claimant was "totally disabled" is yet another factor that can render the denial of further

long-term disability benefits arbitrary and capricious." Lopes v. Metro. Life Ins. Co., 332 F.3d 1, 6 n. 9 (1st Cir. 2003); Whatley v. CNA Ins. Co., 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) (per curiam); Edgerton v. CNA Ins. Co., 215 F. Supp. 2d 541, 549 (E.D. Pa. 2002); Dorsey v. Provident Life & Accident Ins. Co., supra.

In addition, Post held that a "disagreement is relevant though not dispositive, particularly (as here) when the administrator rejects the very diagnoses on which the Social Security benefits determination is based." Post, 501 F.3d at 167.  The disagreement between Dr. Lynch and the Social Security Administration is certainly relevant here since Dr. Lynch was of the opinion that Post was never disabled, but rather her disabling pain was psychological in nature.  Dr. Lynch also failed in his report to even mention that Social Security found her totally disabled. Furthermore, Hartford never addressed the fact that Post was awarded Social Security benefits other than to attempt to have those benefits offset her LTD benefits.

### 3.    Hartford's Aggressive Tactics

Lastly, we find that Hartford's aggressive tactics toward Post after its initial grant of benefits are yet another factor, along with its conflict of interest, which supports our conclusion that Hartford's termination of benefits was arbitrary and capricious.  We discuss several of these tactics below.

First, on October 20, 1998, despite the fact that the Plan did not allow for such information, Hartford requested the Notice of Award from the Social Security Administration so that it could "calculate the correct long-term disability benefit."  (HLI00847).  Post's attorney responded that Hartford was not entitled to receive a portion of Post's Social Security Disability benefits pursuant to the language of the LTD benefit plan.  (HLI00719).  Eventually, Hartford

30

stopped requesting information regarding Post's Social Security award of disability benefits.

Second, Hartford conducted a surveillance of Post in early 2000 which proved to be fruitless.  On February 28, 2000, Sabrina A. Misiaszek sent an internal memorandum to Hartford employee Nicholas A. Courto, stating that surveillance was unsuccessful as the "claimant was not observed leaving her home."  (HLI00793).  However, despite this finding, which clearly supported Post's claim of continued disability, Hartford continued with aggressive actions aimed toward terminating and/or reducing her LTD benefits.

Third, on February 29, 2000, Hartford requested that Post send her tax returns for the tax years 1995-1999, a completed Authorization form and Claimant Questionnaire.  (HLI00787).  On March 13, 2000, Post responded with a completed and signed Claimant Questionnaire and Authorization to Obtain and Release Information.  However, as advised by her attorney, Post refused to submit the tax returns, claiming that she was not working, and had no earned income from 1995-1999.  (HLI00420; HLI00726).  On May 12, 2000, Hartford again requested Post's 1995-1999 tax returns.  This time, Hartford cited the Plan's language specifying that Hartford considered "all other income from any employer or for any work" that Post received when calculating her monthly benefit.  (HLI00027; HLI00415-16).  On June 30, 2000, Post, through her attorney, sent her 1995-1999 tax returns and protested that she was only agreeing because Hartford threatened to terminate her LTD benefits.  (HLI01345; HLI00397-408; HLI00368-94; HLI00347-66).  Incidently, such tax returns corroborated Post's assertion that she had earned no additional income during these years.

Lastly, in June 2001, Hartford attempted to have a third party, Empire Medical Management, set up a FCE to evaluate Post's claim for continued benefits.  (HLI01048-49).  The

31

parties disagree on whether Post refused the FCE.  Hartford claims it instructed Empire Medical to make arrangements through Post's lawyer, (HLI00314), and that its efforts were rebuffed by Post's lawyer, who claimed Post had not agreed to submit to an FCE.  (HLI00059-60).  As a result, Empire Medical Management notified Hartford on June 18, 2001, that Post refused to submit to the FCE.  (HLI01282-83).

However, instead of directly contacting Post or her attorney, Hartford then contacted MAG requesting that it "review [Post's] medical records and speak to Post's primary care physician in order to identify [Post's] functional capabilities and address the claimant's ability to perform [a] sedentary to light occupation."  (HLI01299).  On September 20, 2001, Dr. Malievskaia, an Associate Medical Director of MAG, reported her findings from her review of Post's medical records, and stated that she "found no objective evidence substantiating this claimant's inability to perform sedentary to light occupation."  (HLI01303).  Hartford, thereafter, based its initial termination of Post's benefits on the opinion of a non-examining physician.  For all of the aforesaid reasons, these factors support the conclusion that Hartford's decision to terminate Post's LTD benefits was arbitrary and capricious.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                          :
CAROL A. POST,                            :         CIVIL ACTION
                                          :
             Plaintiff,                   :
                                          :
      v.                                  :         No. 04-3230
                                          :
HARTFORD INSURANCE                        :
COMPANY,                                  :
                                          :
             Defendant.                   :
_____:

## ORDER

     **AND NOW**, this 2nd day of October, 2008, upon remand from the Court of Appeals and reconsideration of Defendant's Motion for Summary Judgment (Doc. No. 34), the Response and Exhibits attached thereto, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**, and judgment is entered in favor of plaintiff, Carol A. Post, and against defendant, Hartford Insurance Company.

                                       BY THE COURT:


                                       Robert F. Kelly_____
                                       ROBERT F. KELLY
                                       SENIOR JUDGE